## CHICAGO TITLE & TRUST CO. v. FOX THEATRES CORPORATION et al.

District Court, S. D. New York.
Nov. 13, 1935.

Gustavus A. Rogers, Charles H. Stone, and Abraham Benedict, all of New York City, for Class A Stockholders' Protective Committee.

Archibald Palmer, of New York City, for intervening creditors.

Basil O'Connor and Henry Brill, both of New York City (Arnold T. Koch, of New York City, of counsel), for the receiver.

Robert Aronstein, of New York City, for Trust Co. of Georgia and others, claimants.

Bainton, McNaughton & Douglas, of New York City, for St. Louis Union Trust Co.

Beekman, Bogue, Leake, Stephens & Black and Morton G. Bogue, all of New York City (Leslie B. Soper, of New York City, of counsel), for Roxy Theatre's noteholders committee and Halsey, Stuart & Co.

MANTON, Circuit Judge.

This is an application by the Stockholders' Protective Committee of the Fox Theatres Corporation for an order directing the receiver to proceed in the purchase of 50 per cent. of the stock of the Metropolitan Playhouses, Inc., according to an option granted to him pursuant to an agreement dated March 25, 1935, as amended by agreement of June 14, 1935, made with the approval of this court.

The Fox Theatres Corporation owned all of the stock of the Fox Metropolitan Playhouses, Inc. A receiver was appointed for the latter. At the time there was a bond issue of $18,458,200 outstanding, and it had unsecured liabilities of $7,500,-000. Fox Theatres Corporation was a creditor as well. The receiver of the Fox Theatres Corporation proposed a plan of reorganization for the Fox Metropolitan Playhouses, Inc., which was submitted to the court and eventually approved. Among other things, the plan approved reduced the bond issue to $6,853,385;

provided for class A stock (no par value) of 282,444 shares, and class B stock (of no par value) of 49,844 shares. All of the class A stock was issued; one-half to the receiver of the Fox Theatres Corporation and one-half to United Artists Theatres Circuit, Inc., of which Mr. Joseph M. Schenck is president and a substantial stockholder. Of the portion of the class A stock to be issued to United Artists Theatres Circuit, Inc., it was contemplated that 20 per cent. thereof would be allocated to the Keith-Albee-Orpheum Corporation; the class B stock was issued to the noteholders in proportion of four shares of said stock to each $1,000 principal amount of notes outstanding. It provided for the payment of $200 cash for each $1,000 note; $550 principal amount of new debentures due in 1945; four shares of class B stock each entitling the holder to receive a maximum of $62.50 per share with simple interest at the rate of 5 per cent. per annum from February 1, 1935, out of any dividends paid by the new company on the class B stock and/or out of moneys paid in redemption of said stock or on dissolution, liquidation, or winding up.

The receiver agreed, in the plan of reorganization, to make available for the purpose of reorganization, the sum of $700,000 in cash to the new company. This he did by entering into an agreement with United Artists Theatres Circuit, Inc., to advance the $700,000. By the terms of that agreement dated March 25, 1935, he agreed:

"B. Upon the final confirmation (as provided in subdivision (h) of Section 77B of the Bankruptcy Act [11 USCA § 207 (h)]) of the said plan of reorganization, you shall be entitled to the delivery to you of 50 per cent of the total authorized capital stock of New Company free from any claims, demands, encumbrances or covenants affecting or regarding the said stock, except as herein specifically provided, and I shall be entitled to the delivery to me of the other 50 per cent of such stock free from any claims, demands, encumbrances or covenants affecting or regarding the said stock, except as herein specifically provided, and you shall coincidentally with the delivery to you of such stock, pay said sum of $700,000, less the amount of any deposit theretofore made pursuant to paragraph 5, subdivision A hereof upon the following terms and conditions:

"(a) Out of the said total sum of $700,-000, $425,000 thereof shall be deemed to have been paid by you as the purchase price of 50 per cent of the total authorized capital stock of said 'New Company,' fully paid and non-assessable, and $275,000 thereof shall be deemed to be an advance by you upon the terms and conditions set forth in the next succeeding subdivision (b) hereof. In the event that I shall require a total sum in excess of $700,000 in cash, in order to consummate the said plan of reorganization, then and in that event you do agree to forthwith pay over such excess over $700,000 at the time and place you are required to pay the said $700,000 or any balance thereof. In no event shall anything herein contained require you to pay and/or advance, however, a total sum of more than $750,000 except as such additional payment may be required pursuant to paragraph 7 hereof. In the event that you are required to provide such excess, then fifty per cent of said excess shall be deemed added to the cost to you of the said fifty per cent of the stock aforesaid of the New Company and fifty per cent of such excess shall be deemed an advance upon the same terms and conditions and repayable, if at all, in the same manner as is provided with regard to said sum of $275,000.

"(b) The said advance referred to hereinabove, whether $275,000 or in excess thereof, shall be repayable only in the event that I shall elect to repay the same. If such election be made, then repayment must be made within sixty days from the date on which such advance shall have been made, and I shall be entitled upon such repayment to the immediate possession and ownership of said stock free of any claims, demands, encumbrances or covenants affecting or regarding the said stock, except as is in paragraph 10 provided. In no event shall you be credited with, entitled to, or paid interest on said sum advanced as herein set forth. In connection with the repayment thereof, time shall be of the essence. In no event shall the undersigned personally, or as Receiver, or the Estate which he is administering, be obligated to repay (in the absence of such election) such advance, but on the contrary in the event that I shall not elect to make

repayment to you thereof, you shall be firmly bound and required to purchase the said fifty per cent of the stock of the New Company theretofore acquired by me, and my failure to make repayment to you within the time limited therefor shall obligate me to sell said stock to you, all upon the following terms of purchase and sale; in payment thereof you shall be required to cancel, satisfy and discharge the said obligation, if any, to repay the said advance before referred to, by execution and delivery of a duly executed and acknowledged release in form and substance exactly as set forth in Exhibit I annexed to the escrow agreement hereto annexed as Exhibit A, except that all blanks now appearing thereon shall be filled in, and in addition thereto concurrently pay to me as Receiver the sum of $150,000 in the manner and within the time limited therefor in the annexed proposed escrow agreement marked Exhibit A, and thereupon you shall be entitled to the immediate possession and ownership of said stock free of any claims, demands, encumbrances or covenants. Your failure to deliver such duly executed release and/or to make the said payment of $150,000 as provided in the escrow agreement hereunto annexed and marked Exhibit A shall at my option allow me to elect (by giving you notice by registered mail thereof), to deem your covenant to purchase breached and said advance and excess, if any, to have been paid on account of the total purchase price, to wit, $425,000, plus one-half of the excess, and thereupon I shall 'ipso facto' be deemed to be released and discharged from any obligation to make repayment to you of the said advance, and shall be entitled to the possession of the said fifty per cent of the stock referred to in this subdivision (b), free from any claim thereto or therein by you. In connection with the payment by you of the said $150,-000, as is by the said escrow agreement provided for, time is of the essence."

And further:

"10. If I shall make the repayment referred to in paragraph 5, subdivision B, subparagraph (b) hereof, and shall thereupon receive the said stock therein referred to, then and in that event I do agree that the said stock may not be sold, transferred, alienated, hypothecated, pledged or otherwise disposed of by me unless the same shall first be offered to you for purchase at a purchase price equal to the amount of the said repayment made by me to you plus the sum of $150,000, and you shall have failed to pay me said purchase price within thirty days after the making by me of the said offer, said offer to be made by registered mail. Upon your so paying said purchase price to me, I shall deliver or cause to be delivered said stock to you. Upon your failure to make payment of the said purchase price within the said thirty day period, I and/or any successor of mine in interest shall be free after such thirty day period to sell, transfer, hypothecate, pledge, alienate or otherwise dispose of the said stock free from any restriction whatsoever. Subject, however, to the provisions contained in the immediately succeeding unnumbered paragraph, nothing herein contained shall be deemed to limit my right to transfer the said stock to any company or new corporation which may become entitled thereto as a result of the reorganization of the assets of the said estate; nor shall any of the restrictions or limitations aforesaid survive the distribution of the said stock, pro rata among such creditors and/or stockholders of the Fox Theatres Corporation as may be entitled thereto in the event that a final order of liquidation or distribution of all the said estate shall be entered, nor shall the same be deemed to limit or prevent such distribution.

"However, if the said stock shall be transferred to a corporation as the result of a reorganization of the Estate of which I am Receiver, the said limitations upon the right to sell, transfer, mortgage, pledge, hypothecate, dispose of or otherwise alienate the said stock, shall continue to attach to the said stock after transfer to any company or new corporation which may become entitled thereto as a result of the reorganization of the assets of said estate."

The plan provided for the issuance of the new debentures with interest and sinking fund requirements, and until 50 per cent. of the new debentures had been retired or provision made therefor, and the amount necessary to effectuate retirement thereof should have been paid to the indenture trustee or the sinking fund agent, no dividends might be paid on the stock of the new company. Until 90 per cent. of the debentures have been retired, the company is obliged annually to set

up on its books a reserve for obsolescence, depreciation, amortization, replacement, etc., of an amount equal to one-twentieth of the amount of the new debentures outstanding at the commencement of each fiscal year, and no part thereof shall be used for the declaration of dividends or capital distribution until 90 per cent. of the debentures had been retired and the amount so reserved shall not thereafter be used for dividends or capital distribution except to the extent that the amount thereof shall exceed the total amount of the then outstanding debentures. Until all the new debentures have been retired or provision made therefor and the amount necessary to effectuate retirement thereof shall have been paid to the indenture trustee or the sinking fund agent, no dividends shall be paid out of the profits or surplus or earnings arising from appreciation or write-up in value of any of the property or assets of the new company or out of any original surplus with which the new company may commence business.

The earnings of the new company will be derived chiefly from rents and dividends. The net rental income upon a fixed basis will be receivable under leases and subleases of its theatres to two operating corporations. In addition, dividend incomes will be receivable as and when declared on 50 per cent. of the stock of the operating companies which the new company will own free from option. The new company is now functioning, and the theatres are operated by operators provided for in the plan of reorganization.

Fox Theatres Corporation can realize no gain from an increase in the value of the stock because of the limitations that before the stock may be sold or pledged, it must first be offered to the United Artists Theatres Circuit, Inc., at cost. This limitation does not apply if the stock is distributed by Fox Theatres Corporation to its creditors or stockholders.

Creditors representing claims against the Fox Theatres Corporation in the amount of $13,245,066.17 are opposing the purchase, and they declare that they do not want a settlement by Fox Theatres Corporation in which the Metropolitan Playhouses stock would be distributed to them; they have agreed and insist they want cash. They point out a serious disadvantage which would result from such distribution. Since United Artists Theatres Circuit, Inc., now owns 50 per cent. of the stock, if it were distributed by Fox Theatres Corporation to its creditors, they say the United Artists Theatres Circuit, Inc., or its interests could pick up a small number of shares and thus control the Metropolitan Playhouses. If disposition at a profit is impossible and distribution is distasteful, the only method of benefiting from the purchase would be by dividends. There is no prospect of dividends within a reasonable time from the Metropolitan Playhouses stock. The plan of reorganization forbids, until 50 per cent. of the new debentures are retired, payment of dividends other than dividends up to 7 per cent. of the par value of any par value preferred stock which may be issued. The stock on which the Fox Theatres Corporation has an option therefor could receive no dividend until 50 per cent. of the new debentures are retired at a price of $3,426,692.50. Expenses and reserve to be deducted from the gross income before a fund would be available for the retirement of the debentures would be interest at 5 per cent. on $6,853,385 (new debentures), $342,669.25; reserve for obsolescence, depreciation, etc., one-twentieth of the amount of outstanding new debentures, $342,669.25; operating expenses estimated at $100,000; interest on underlying mortgages estimated at $46,000—a total of $831,338.50. In ascertaining the possibility of dividends, another deduction must be made in an amount equal to 50 per cent. of the net income for the preceding year to be paid into a sinking fund for the debentures. The available sources of substantial income are rents and dividends from 50 per cent. of the stock of the operating companies (Rand Force Amusement Corporation and Skouras Theatres Corporation). The highest estimates of any receipts from rental is $885,234.48; deducting the charges against this as estimated above, the sum of $53,895.98 from rents would be available for the retirement of bonds. There are no reliable estimates in the record of the income from dividends on the operating companies' stock. However, the most recent past records may be taken. Rand-Force Amusement Company earnings for the year were $90,000. Deducting 24 per cent. for taxes, which is regarded as sufficient, the net is $68,400; and adding to

 

this nonrecurring legal fees of $30,000, there is available $98,400 for dividends on the Rand-Force Amusement Company stock. Skouras Theatres Corporation net earnings for the year ending October 19, 1935, were $90,000; deducting taxes of 24 per cent., there was a net of $72,-960. A rent reduction of $120,000 was passed on to the two operating companies. This should increase their profit by this amount. Deducting taxes, it would mean $91,200 more available for dividends. From these figures, it appears that any substantial income to be derived by the Metropolitan Playhouses by virtue of their 50 per cent. stock ownership in these operating corporations, depends entirely upon expectation of improvement in the business. While this is indicated during the last six months, its continuation is speculative, and while it may be a good speculative prospect, it is a venture of an improper character for the investment of funds in a receiver's hands.

The special master appointed is now actively engaged in liquidating the claims presented against the Fox Theatres Corporation. He has not filed his report, but upon request has submitted to the court an estimate of the possible allowable claims. It is estimated that these will be between six and eight million dollars. The creditors have a prior right to payment over stockholders. The large majority are opposing the order prayed for. The indications clearly point, at the present time, to the inability of the corporation to pay the creditors in full.

No plan of reorganization has been suggested for Fox Theatres Corporation wherein the creditors might be willing to accept less than the face value of their claims. In the absence of such a suggestion, the court must assume that they have the first right to all the assets of the corporation and at the present time it is plainly indicated that the stockholders of the Fox Theatres Corporation have small hopes of realizing on their stock. There are still some contingent claims which the Fox Theatres Corporation have, now in litigation, which might in time change this situation.

Under all these circumstances, the option should not be exercised, and the receiver is directed to take the $150,000 agreed to be paid by the United Artists Theatres Circuit, Inc., for 50 per cent. of the stock held by the Fox Theatres Corporation under the plan of reorganization.

Motion denied.